# EXHIBIT 3

## EXPRESS SERVICE MASTER SERVICES AGREEMENT

**THIS EXPRESS SERVICE MASTER SERVICES AGREEMENT** (this **"Master Services Agreement"** or **"MSA"**) is made and entered into as of                 (the **"Effective Date"**) by and between **Hibernia Express (Ireland) Limited**, a company formed under the laws of the Republic of Ireland (**"Hibernia"**), and the Customer Identified on the signature page to this Master Services Agreement (the **"Customer"**).

### RECITALS:

**WHEREAS**, Hibernia, through various subsidiaries, has constructed a new trans-Atlantic cable system that connects various cities in Europe and the United States and which has the lowest latency of any existing trans-Atlantic system between certain cities including

**WHEREAS**, Hibernia is offering the low latency transport services, on a first come, first served basis, to a select group of customers;

**WHEREAS**, Hibernia wishes to sell to Customer, and Customer wishes to purchase from Hibernia, the Service(s) specified from time-to-time in one or more approved Hibernia service order forms (each a **"Service Order Form"**), the form of which is attached hereto as **Schedule A**;

**NOW, THEREFORE**, in consideration of the mutual promises set forth below, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

### 1. DEFINITIONS

The following terms shall have the meanings set forth in this Section when used in this Agreement, unless explicitly stated to the contrary:

**"Acceptance Date"** has the meaning given to it in Section 4.2 of this Master Services Agreement.

**"Acceptance Period"** has the meaning given to it in Section 4.2 of this Master Services Agreement.

**"Access Rights"** means any easements, permits, authorizations, rights-of-way or other rights of access that must be obtained by Hibernia in connection with the Hibernia Cable System.

---

"**Affiliate**" means any person or entity (i) which directly or indirectly controls or is controlled by, or is under common control with, a party hereto, or (ii) fifty percent (50%) of which is held beneficially or of record by a party hereto or one of its subsidiaries.

"**Agreement**" means this Master Services Agreement, together with the SLA and one or more Service Order Forms executed by the parties.

"**Agreement Term**" has the meaning given to it in Section 2 of this Master Services Agreement.

"**Assumed MRC**" means the Lease Fee divided by the number of months in the Initial Service Term, if the Service Order Form specifies that Customer will pay all or a portion of the Lease Fee up front.

"**Business Day**" means any Monday to Friday excluding public, bank or statutory holidays in Dublin, Ireland.

"**Competing Latency**" has the meaning given to it in the SLA attached hereto.

"**Completion Notice**" has the meaning given to it in Section 4.1 of this Master Services Agreement.

"**Confidential Information**" has the meaning given to it in Section 16.1 of this Master Services Agreement.

"**Customer**" means the Person identified as the Customer on the signature page of this Master Services Agreement and in the associated Service Order Form(s).

"**Effective Date**" has the meaning given to it in the first paragraph of this Master Services Agreement.

"**Event of Insolvency**" means in relation to a party: (i) such party makes a general assignment for the benefit of creditors, files a voluntary petition in bankruptcy or any petition or answer seeking, consenting to, or acquiescing in reorganization, arrangement, adjustment, composition, liquidation, dissolution or similar relief, or (ii) an involuntary petition in bankruptcy or other insolvency protection is filed against either party and not dismissed within one hundred twenty (120) days thereafter.

"**Evidence**" has the meaning given to it in the SLA attached hereto.

"**Extended Service Term**" has the meaning given to it in Section 2 of this Master Services Agreement.

---

"**Force Majeure Event**" means any cause beyond the reasonable control and without the fault or negligence of the affected party and which by the exercise of reasonable diligence the affected party was unable to prevent provided that event or circumstance is limited to the following: acts of God or nature; insurrection or civil disorder; war; fires, earthquakes, floods or other natural disasters or catastrophic events (but excluding weather conditions regardless of severity); sabotage; or acts of a governmental authority preventing or in any way limiting the use of the Hibernia Cable System by Hibernia; For avoidance of doubt, the parties acknowledge that any change in a governmental rule, regulation or law that negatively impacts, or interferes with, Customer's intended use of the Tier 1 Service shall not, under any circumstance, be deemed a Force Majeure Event.

"**Hibernia**" has the meaning given to it in the first paragraph of this Master Services Agreement.

"**Hibernia Cable System**" means the new trans-Atlantic cable system and its

"**Initial Service Term**" has the meaning given to it in Section 2 of this Master Services Agreement.

"**Interest Rate**" has the meaning given to it in the Section 3.2 of this Master Services Agreement.

"**Lease Fee**" has the meaning provided in Section 3.1.

"**Market Data**" means any and all data (including, but not limited to, data regarding transactions, orders, cancelations and other activity) from or derived from any exchange, market, platform or venue for the trading of securities, commodities, currencies, bonds, indexes, options, or other financial instruments and/or any futures, forwards or other derivatives on or referenced to any of the foregoing or any corporate, governmental or other news or public releases of information.

"**Master Services Agreement**" or "**MSA**" has the meaning given to it in the first paragraph of this Master Services Agreement.

"**Material Authorizations**" has the meaning given to it in Section 23 of this Master Services Agreement.

"**MRC**" means monthly recurring charge.

"**Person**" means any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

"**Proprietary Trading**" means the high frequency or algorithmic trading of, or other dealing or trading in, marketable securities and other instruments for the Customer's and its Affiliate's own account including, but not limited to, foreign exchange contracts, commodities, derivatives, debt instruments and shares as well as anything reasonably necessary to support such high frequency or algorithmic trading, such as the transport of Market Data solely for the internal use of Customer and its Affiliates.

"**Refunded Amount**" has the meaning given to it in Section 3.4 of this Master Services Agreement.

"**RTD**" has the meaning given to it in Schedule B (Service Level Agreement).

"**Scheduled Maintenance Window**" means from 12:00 midnight to 6:00 a.m. (local time in London, England).

"**Secured Party**" has the meaning given to it in Section 29.2 of this Master Services Agreement.

"**Service**" means each Tier 1 Service ordered by Customer hereunder.

"**Service Order Form**" has the meaning given to it in the third recital to this Master Services Agreement.

"**Service Term**" has the meaning given to it in Section 2 of this Master Services Agreement.

"**SLA**" means the service level agreement attached hereto as **Schedule B.**

"**Start Date**" has the meaning given to it in Section 4.5 of this Master Services Agreement.

"**Taxes**" has the meaning given to it in Section 3.5 of this Master Services Agreement.

## 2. TERM

This Master Services Agreement shall take effect upon its execution by both parties and shall remain in effect until the expiration of the last service provided hereunder, unless earlier terminated as provided in this Master Services Agreement (the "**Agreement Term**").

The term, with respect to each Service, shall begin on the Acceptance Date and, subject to any break options provided for in the applicable Service Order Form, shall extend for a period of years thereafter as set forth in the applicable Service Order Form (the "**Initial Service Term**"). Unless either party has provided the other party with notice of its intention to terminate the Service at least sixty (60) days prior to the expiration of the Initial Service Term, the Initial Service Term shall automatically continue on a month-to-month basis (the "**Extended Service Term**" and together with the Initial Service Term, the "**Service Term**"), at the then prevailing rate for the Service on the applicable route. Unless otherwise specified in the applicable Service Order Form and without limiting the generality of the foregoing, Customer shall be entitled to terminate the Service at no additional cost at any time following the end of the Initial Service Term upon no less than sixty (60) days prior written notice to Hibernia.

## 3. PAYMENTS; TAXES

3.1   Save as otherwise provided for in the Service Order Form, the first invoice shall contain any non-recurring fees associated with the Service and the initial monthly, quarterly or annual lease fee specified therein (the "**Lease Fee**").   Save as otherwise provided for in the Service Order Form, thereafter, the recurring fees will be invoiced monthly, quarterly or annually in advance, as specified in the applicable Service Order Form.   Any additional non-recurring fees incurred by Hibernia on Customer's behalf will be invoiced in the month following the month in which they are incurred.

3.2     The undisputed portion of all invoices shall be due and payable within thirty (30) days of the date of receipt of invoice. All payments under this MSA shall be made in US dollars by wire transfer of immediately available funds to the account specified by Hibernia in the applicable invoice. If Customer fails to pay any undisputed amount when due, Customer shall pay interest on such unpaid amount at the rate of one and one half percent (1.5%) per month (the "**Interest Rate**") until such amount is paid in full.

3.3     Customer shall notify and provide Hibernia with supporting documentation concerning any charge disputed in good faith within forty five (45) days of receipt of the applicable invoice. In no event shall Customer's notice of a good faith dispute relieve Customer from its obligation to pay, in full, all undisputed amounts. Customer agrees to pay all costs of collection of undisputed amounts, including reasonable attorney's fees. No interest shall accrue on any payment that is disputed in good faith by Customer while such dispute is pending. Notwithstanding the foregoing, if such dispute is later resolved in favor of Hibernia, such amount shall bear interest, at the Interest Rate, from the date originally due until payment in full is received by Hibernia.

3.4     Subject to the following, all payments required to be made to Hibernia by Customer under the applicable Service Order Form shall be made without any deduction or withholding for or on account of any applicable taxes, fees, levies, imposts, duties, charges or withholdings of any nature, including value-added taxes ("**Taxes**"), or governmental fees and surcharges (such as Universal Service Fund fees) imposed by any governmental authority on any payment due hereunder; provided, however, that the term "Taxes" shall not include any tax imposed upon, or measured by, the net income of Hibernia. If a value-added tax is payable with respect to the Service provided to Customer hereunder, Customer shall pay to Hibernia on demand, supported by a valid value-added tax invoice, the amount of the value-added tax so payable. If Customer is, becomes, or was required by law to make any deduction or withholding for any Tax from any payment due hereunder to Hibernia, then, notwithstanding anything to the contrary contained in this Master Services Agreement, unless such deduction or withholding results from a change in the tax status or jurisdiction of Hibernia, the gross amount payable by Customer to Hibernia will be increased so that, after any such deduction or withholding for Taxes, the net amount received by Hibernia will not be less than Hibernia would have received had no such deduction or

Final     Hibernia Networks Proprietary Information     © Copyright 2011-2015 Hibernia Networks.
All rights reserved.

withholding been required to be made on payments due hereunder. Hibernia shall promptly furnish to Customer any forms reasonably requested by Customer in order to qualify any payment due hereunder for an exemption from any Tax to the extent Hibernia shall be legally entitled to do so. Should Hibernia receive a refund of some or all of such Taxes (the "**Refunded Amount**"), it shall promptly refund the Refunded Amount to Customer. Each party agrees that they will provided reasonable cooperation to the other concerning audits or other such inquiries, filings or reports as may relate solely to the activities or transactions arising from or under this MSA, which may be required or initiated from or by any duly authorized governmental tax authority.

3.5     Payment of all sums due to Hibernia under this Master Services Agreement must be made by Customer, in full, without any set-off, deduction (except as provided herein for disputed amounts), withholding or counterclaim, and the time of payment of all sums due to Hibernia under the Agreement is of the essence.

4.  **DELIVERY, ACCEPTANCE; COMPLETION NOTICES**

4.1     When Hibernia determines that the Service is operating substantially in conformity with the SLA, Hibernia shall promptly provide Customer written notice of the same (a "**Completion Notice**"). Each Completion Notice shall set forth the date upon which Hibernia intends to commence delivery of the Service to Customer.

4.2     Customer shall have up to ten (10) Business Days from the date Hibernia delivers the Service to Customer to test the Service for conformance to the SLA and provide Hibernia a written notice either accepting or rejecting the Service (the "**Acceptance Period**"). The date on which an acceptance notice is received will be the **"Acceptance Date",** which date will be deemed to occur on expiry of the Acceptance Period if Customer has failed to notify Hibernia of its acceptance or rejection of the Service within the Acceptance Period and payment of the Lease Fee shall be due and owing on such date (the "**Start Date**").

4.3     In the event of a good faith rejection of the Service during the Acceptance Period, Hibernia shall take such action as it deems reasonably necessary, and as expeditiously as practicable, to correct or cure such defect or failure and repeat the Completion Notice process described above. Customer shall have the right to terminate this Agreement without liability if the Service continues to fail

Final    Hibernia Networks Proprietary Information      © Copyright 2011-2015 Hibernia Networks.
All rights reserved.

Customer's conformance tests beyond ninety (90) days after delivery of the Completion Notice.

4.4 Customer may request Hibernia to obtain a physical connection (local access point) from a Customer site to the nearest Hibernia point of presence beyond the "A End" ████████████████████████████████████████████

████████████████ If Hibernia agrees to provide a Tail Circuit then Hibernia shall procure the required Tail Circuit subject to the following conditions which Customer acknowledges by its order of such Tail Circuit: (a) the Tail Circuit(s) will be manufactured and provided by a third party operator; (b) the Tail Circuit(s) will function and perform in accordance with the service level undertakings provided by the third party operator that provides the Tail Circuit(s); (c) any rights, remedies, credits or service Customer may have or be entitled to regarding a Tail Circuit are limited to those rights, remedies, credits or service provided to Hibernia by the third party operator or manufacturer of the Tail Circuit; (d) the third party estimated costs for the Tail Circuit are incorporated within the fees set forth in the associated Service Order Form and are subject to survey of Customer's Site by the third party and may be subject to change in price, both upwards and downwards, any such change to be passed on to Customer in its entirety; and (e) if Customer cancels the Service prior to the conclusion of the Service Term, then Customer will pay any and all cancellation charges that Hibernia owes to third parties in respect of the Tail Circuit(s).

4.5 Unless otherwise specified in the Service Order Form, Customer is responsible for

████████████████████████████████████████████████████

████████ and also for the Tail Circuit but Hibernia will provide reasonable assistance to enable Customer to make such arrangements and to agree terms with applicable third party providers. The Customer will be responsible for all costs incurred in relation to these services. Hibernia will have no liability whatsoever with respect to such service , and Customer shall indemnify and hold Hibernia harmless from any claims, costs, expenses, damages and losses arising from the provision or functioning of any such service. No delay in the provisioning of any such service shall delay the commencement of billing on the Start Date.

4.6 ████████████████████████████████████████████████



4.7 Unless otherwise agreed between the parties, Customer will not be permitted to install or disconnect equipment which connects directly to the Hibernia Cable System. Any such installation or disconnection work will, if required, be performed by Hibernia, and Customer will pay Hibernia's reasonable fees and documented expenses for such work.

4.8



5. TERMINATION

Final    Hibernia Networks Proprietary Information     © Copyright 2011-2015 Hibernia Networks.
All rights reserved.

5.1 

5.2 Notwithstanding the foregoing, no termination or expiration of the Agreement shall affect the rights or obligations of any party hereto with respect to any then existing defaults or the obligation to make any payment hereunder for Services rendered prior to the date of termination or expiration.

## 6. ACCESS TO CUSTOMER SITES

6.1 Customer shall grant Hibernia access to, and use of, Customer's facilities at each Customer Site to the extent reasonably necessary for the installation, connection, removal and maintenance of equipment, facilities and systems relating to a Service. Hibernia will provide Customer with reasonable notice in advance of requiring such access. Customer shall be responsible for providing and maintaining, at its own expense, the level of power, humidity, heating and air conditioning necessary to maintain a proper environment for the equipment in each Customer site.

6.2 In the event that Customer fails to meet its obligations regarding access and facilities maintenance hereunder and, as a result, Hibernia is unable to install or continue the delivery of a Service, such event shall be treated as a material breach by Customer subject to section 11.1 hereof.

Final    Hibernia Networks Proprietary Information    © Copyright 2011-2015 Hibernia Networks.
All rights reserved.

**7. USE OF SERVICE; HIBERNIA'S RESTRICTION ON SALES OF TIER 1 SERVICES TO MARKET DATA COMPANIES**

7.1 Customer: (a) may only use the Tier 1 Service for (i) Proprietary Trading purposes, (ii) the transfer of Market Data for its and its Affiliates internal use, and (iii) its own internal telecommunications services; under no circumstance may the Customer resell or share the Service, in whole or in part, to or with any other Person who is not an Affiliate; (b) shall use each Service in compliance with, and subject to, all applicable government codes, ordinances, laws, rules and regulations; (c) shall secure, prior to the Acceptance Date with respect to each Service, and maintain in full force and effect during the applicable Service Term, any and all necessary approvals, consents, rights of way, permits, franchises, licenses or similar approvals from all governmental and other authorities which are necessary or required to be obtained by Customer; (d) shall not use its systems or any Service in a way that knowingly interferes in any way with, or adversely affects, the use of the Hibernia Cable System or any other person using the Hibernia Cable System or any communications and/or data services thereon, and it shall not physically access in any manner the Hibernia Cable System or any components thereof; and (e) will not use the Service for the transmission of content which (i) is indecent, offensive or obscene material, (ii) constitutes defamation or libel of Hibernia or any third party, or (iii) results in any liability of Hibernia to any third party.

7.2 In addition, Customer represents that it has obtained or will obtain, on a timely basis, all permissions and consents from third parties necessary to allow Hibernia to access any Customer site, including permission to cross real property to access Customer's facilities.

7.3 



(i) 

(ii) 

---

## 8. SLA, MAINTENANCE, REPAIR AND UPGRADES

8.1 From and after the Acceptance Date, Hibernia shall provide the Service in good working order and in accordance with the SLA. Without prejudice and subject to Hibernia's obligations and the Customer's remedies set out in the SLA, in the event of a disruption of the Service, Hibernia shall cause Service to be restored as quickly as reasonably possible and shall take such measures as are reasonably necessary to achieve such objective.

8.2 Hibernia shall use commercially reasonable efforts to perform all scheduled maintenance (which may include, without limitation, substituting, changing, converting and reconfiguring equipment and facilities with respect to a Service) during the Scheduled Maintenance Window. In the event Hibernia determines that it is necessary to interrupt a Service for the performance of scheduled maintenance during a Scheduled Maintenance Window, Hibernia will use commercially reasonable efforts to notify Customer at least seven (7) days prior to such interruption.

8.3 Hibernia shall use reasonable efforts to minimize interruption to, or impairment of, a Service arising from the implementation of any enhancement or upgrade to the Hibernia Cable System. In no event shall interruption for enhancements, upgrades or maintenance constitute a failure of performance by Hibernia of a Service in any manner.

## 9. INDEMNITY; DISCLAIMER OF WARRANTIES

9.1 Hibernia agrees to indemnify, defend and hold harmless Customer from and against all expenses and costs and damages (including any reasonable legal fees and expenses), claims, demands, proceedings, suits and actions, and all liabilities resulting from, in connection with, or arising out of any third party claim that the Service and/or the software (if applicable), or Customer's use thereof, infringes any copyright, patent, trademark, trade secret or other intellectual property rights; provided, however, that Hibernia will have no obligation to defend Customer or pay any liabilities under this section for any claim based on (a) the unauthorized modification of a Service by Customer or a third party under the direction of Customer; (b) Hibernia's modification of a Service in accordance with

Final    Hibernia Networks Proprietary Information    © Copyright 2011-2015 Hibernia Networks.
All rights reserved.

Customer's specific instructions; (c) infringing items of the origin, design or selection of Customer or a third party under the direction of Customer; or (d) the operation, combination or use of a Service by Customer or a third party under the direction of Customer in breach of the terms of this Agreement.

9.2 **HIBERNIA HAS THE RIGHT TO PROVIDE THE SERVICE AND THE SERVICE DOES NOT INFRINGE THE INTELLECTUAL PROPERTY OR OTHER PROPRIETARY RIGHTS OF ANY THIRD PARTY. EXCEPT FOR THE INDEMNITY IN SECTION 9.1 ABOVE OR AS EXPRESSLY STATED IN THE SLA, THE SERVICE AND ALL EQUIPMENT IS PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS. HIBERNIA MAKES NO WARRANTY, REPRESENTATION OR INDEMNITY OF ANY KIND, WHETHER EXPRESS OR IMPLIED, WITH RESPECT TO THE DELIVERY OR PERFORMANCE OF ANY SERVICE, THE HIBERNIA CABLE SYSTEM, OR ANY WORK TO BE PERFORMED, INCLUDING ANY AND ALL WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR USE, SATISFACTORY QUALITY OR NON-INFRINGEMENT, OR ARISING FROM A COURSE OF DEALING, USAGE OR TRADE, AND ALL SUCH WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED. HIBERNIA ALSO SPECIFICALLY DISCLAIMS ANY REPRESENTATION OR WARRANTY THAT THE SERVICE, ANY SOFTWARE OR EQUIPMENT WILL BE ERROR FREE, SECURE OR UNINTERRUPTED.**

### 10. LIMITATION OF LIABILITY

10.1 Notwithstanding any provision of this MSA to the contrary, except for a party's breach of its obligations under Section 16, each party's maximum cumulative liability to the other (if any) in connection with a particular Service Order Form shall be limited to direct damages, in the aggregate, in an amount equal to three (3) months of MRC.

10.2 **NOTWITHSTANDING ANY PROVISION OF THE AGREEMENT TO THE CONTRARY, NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY OR ITS AFFILIATES, WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE HOWSOEVER ARISING, FOR LOSS OF REVENUE OR PROFIT (WHETHER ARISING OUT OF SERVICE INTERRUPTIONS OR DEGREGATION OF THE FUNCTIONING OF THE FIBERS MAKING UP THE HIBERNIA CABLE SYSTEM), GOODWILL, ANTICIPATED SAVINGS, DATA OR PURE ECONOMIC LOSS OR ANY SPECIAL, INCIDENTAL, INDIRECT, PUNITIVE OR CONSEQUENTIAL COSTS, LIABILITIES OR DAMAGES, WHETHER FORESEEABLE OR NOT, ARISING INDIRECTLY OUT OF, OR IN CONNECTION WITH, THE PERFORMANCE OR NON-PERFORMANCE OF ANY**

OBLIGATIONS UNDER OR OTHERWISE RELATED TO, THE AGREEMENT; INCLUDING, WITHOUT LIMITATION, ANY INDIRECT LOSS OR DAMAGE SUSTAINED BY REASON OF ANY FAILURE IN OR BREAKDOWN OF THE HIBERNIA CABLE SYSTEM OR THE FACILITIES ASSOCIATED WITH THE HIBERNIA CABLE SYSTEM. WHATEVER THE CAUSE AND HOWEVER LONG ITS SHALL LAST.

10.3 THE EXCLUSION OF CONSEQUENTIAL, SPECIAL, INDIRECT, INCIDENTAL OR PUNITIVE DAMAGES AND THE LIMITATION OF LIABILITY AS SET FORTH IN THE PRECEDING TWO PARAGRAPHS SHALL NOT APPLY (I) TO HIBERNIA IN RESPECT TO (I) ANY SUCH DAMAGES RECOVERED BY THIRD PARTIES AGAINST THE CUSTOMER IN CONNECTION WITH LOSSES THAT MAY BE INDEMNIFIED UNDER SECTION 9.1 (INDEMNITY; DISCLAIMER OF WARRANTIES) HEREUNDER; OR (II) WITH RESPECT TO EITHER PARTY AS A RESULT OF ANY LOSSES RESULTING FROM A BREACH OF CONFIDENTIALITY OBLIGATIONS PURSUANT TO SECTION 16 (CONFIDENTIALITY) HEREUNDER.

10.4 The limitation of liability provided for in this Section 10 shall survive the expiration or termination of the Agreement until the expiration of all statutes of limitation applicable to any losses, claims, liabilities or damages described in this Section 10.

## 11. DEFAULT

11.1 A default shall exist with respect to a Service if: (a) Customer fails to pay any undisputed amount due within five (5) Business Days after receipt of written notice specifying such breach; (b) in the case of any other material breach, a party fails to cure such breach within ten (10) Business Days after receipt of written notice specifying such breach (a default shall not have occurred so long as the relevant party has commenced to cure within said time period and thereafter diligently pursues such cure to completion within thirty (30) days), (c) upon written notice where Customer makes a material misrepresentation in any submission to Hibernia, (d) upon written notice where an Event of Insolvency occurs with regard to a party.

11.2 In the event of any default, the non-defaulting party may on written notice to the other party avail itself of one or more of the following remedies: (a) take such actions as it determines, in its sole discretion, necessary to correct the default; (b) terminate the Service; and/or (c) pursue any legal remedies it may have under applicable law or principles of equity, including specific performance. Without limiting the foregoing, if the default consists of a failure of Customer to pay

Hibernia any undisputed fees or other amounts due, such default may, in addition to all other remedies, terminate or suspend any and all of its obligations in respect of such Service and any other Service that may exist between the parties. In such case, Hibernia may by notice to Customer also apply any and all amounts previously paid by Customer toward the payment of any other amounts then or thereafter payable by Customer under the applicable Service Order Form and the Agreement.

11.3    In the event Customer is in violation of any applicable laws, statutes, ordinances, or statutory codes with respect to a Service; or if Customer's use of a Service adversely interferes with, or impairs, the Hibernia Cable System; or if Hibernia is so-instructed by any applicable regulatory authority; Hibernia may immediately block Customer's signals or suspend the Service. Hibernia will immediately notify Customer when blockage or suspension occurs and the parties shall work diligently towards restoration of the affected Service. Hibernia will restore the affected Services as soon as the condition giving rise to the blockage or suspension is cured. Such blockage or suspension shall not be included in any SLA calculation.

## 12. FORCE MAJEURE EVENTS

12.1    Except as provided in the SLA, neither party shall be in default under this MSA if, and to the extent that, any failure or delay in such party's performance or one or more of its obligations under the Agreement is the result of a Force Majeure Event, and such party's performance of such obligation or obligations shall be excused and extended for and during the entire duration of any such event.    The party claiming relief under this Section 12 shall promptly notify the other in writing of the existence of the event relied on, the anticipated length of delay, the cause of the delay and a timetable by which any remedial measures will be implemented and a description of those measures.

12.2    As soon as possible after the occurrence of a Force Majeure Event, the affected party shall take all reasonable steps to mitigate the effect of the Force Majeure Event upon its performance of the Agreement.

12.3    Where a Force Majeure Event prevents the performance by Hibernia of this Agreement for a period longer than ninety (90) days after first notification of such Force Majeure Event, then Customer shall have the right to terminate this Agreement in accordance with Clause VII of the SLA (Termination Options).

**13.** [INTENTIONALLY OMITTED]

**14.** SOFTWARE

14.1   If Hibernia provides Customer with software or other intellectual property for use in connection with any Service, Customer   shall have a non-exclusive, non-transferable, revocable (for breach only) license to use such software or other intellectual property solely for its own internal use to the extent necessary to use the Service.   Such license shall not entitle Customer to claim title to, or any ownership interest in, such software or other intellectual property (or any derivations or improvements thereto) and Customer will execute any documentation reasonably required by Hibernia to document Hibernia's existing and continued ownership of, or right to, all such software and other intellectual property.   This license will terminate automatically on expiration or termination of the relevant Service for any reason.

14.2   Customer agrees that it will not, and will not permit others to: (a) copy any such software and/or other intellectual property except as permitted by Hibernia, except as reasonably required for backup purposes and archival and disaster recovery purposes; (b) reverse engineer, decompile or disassemble the software or other intellectual property except to the extent that it cannot be prohibited from so doing under applicable law; (c) sell, lease, license or sub-license the software and/or other intellectual property; (d) create, write or develop any derivative software/intellectual property or any other software program based on the licensed software and other intellectual property or any Confidential Information of Hibernia; or (e) take any action prohibited by the owner of the software and/or other intellectual property (provided the owner's requirements were conveyed to Customer).   The grant of a license in the software and/or other intellectual property is intended by the parties to constitute a license of intellectual property in accordance with 11 U.S.C. Section 365(n).

14.3   Notwithstanding the foregoing, Hibernia hereby acknowledges that the Customer may, currently or in the future, be developing products, platforms and other operations, that may be similar to any software or other intellectual property Hibernia may have provided the Customer for use in connection with any Service. Accordingly, nothing in this MSA or any Service Order Form will be construed as a representation or agreement that the Customer will not develop or have developed for it products, concepts, strategies, ideas, systems or techniques that

Final    Hibernia Networks Proprietary Information    © Copyright 2011-2015 Hibernia Networks.
All rights reserved.

are similar to or compete with the products, concepts, strategies, ideas, systems or techniques embodied in any software or other intellectual property Hibernia may have provided the Customer for use in connection with any Service, provided that the Customer does not violate any of its obligations under this MSA or any Service Order Form in connection with such development.

## 15. EQUIPMENT; INFRASTRUCTURE

15.1    The use of the  Services shall not in any way convey title to, or any interest in, the infrastructure, systems, equipment, facilities or other property of Hibernia (or its Affiliates that own part of the Hibernia Cable System) utilized in connection with the provision of Service.  Customer acknowledges that: (a) Customer shall not, and shall not permit others to, move, rearrange, disconnect, remove, repair, or otherwise tamper with any equipment supplied by Hibernia, without its prior written consent; (b) any equipment provided by Hibernia shall be used solely for the purpose for which it is provided by Hibernia; (c) Customer shall take such actions as are reasonably directed by Hibernia to protect its interest in any equipment provided by it and shall keep such equipment free and clear from all liens, claims and encumbrances; (d) Customer bears the entire risk of loss, theft, destruction or damage to the equipment, if any, placed on any Customer site by Hibernia (except for damage caused by the gross negligence of Hibernia) and shall promptly notify Hibernia of any such loss, theft, destruction or damage; (e) in no event will Hibernia be liable to Customer or any other person for interruption of Service or for any other loss, cost or damage caused by, or related to, improper use or maintenance of the equipment provided by Hibernia to Customer or its agents; (f) if the equipment so provided by Hibernia was manufactured by a third party, then, to the extent permitted, any manufacturer warranties with respect to the equipment will be passed on to Customer by Hibernia and any rights or remedies Customer may have regarding the performance or compliance of the equipment are limited to those rights provided to Hibernia by the manufacturer of the equipment; (g) Hibernia shall not be responsible for any changes to the Service that cause the equipment to become obsolete or require modification or alteration; and (h) Customer agrees to permit Hibernia to periodically inspect its equipment during the Service Term and remove the equipment from any

Final    Hibernia Networks Proprietary Information    © Copyright 2011-2015 Hibernia Networks.
All rights reserved.

Customer site after termination or expiration of the Service provided hereunder in relation to which the equipment was provided.

15.2   Customer shall be solely responsible for the installation, operation, maintenance, use, compatibility of any equipment or intellectual property not provided by Hibernia and Hibernia shall have no responsibility or liability in connection therewith.

### 16. CONFIDENTIALITY

16.1   Hibernia and Customer each hereby agree that if either party provides confidential or proprietary information to the other party ("**Confidential Information**"), such Confidential Information shall be held in confidence, and the receiving party shall afford such  Confidential Information the same care and protection as it affords generally to its own confidential and proprietary information (which in any case shall be not less than reasonable care) to avoid disclosure to or unauthorized use by any third party.   This MSA, including its existence and all of the terms, conditions and provisions hereof, constitutes Confidential Information, and all information disclosed by either party to the other whether in oral, written or other tangible form in connection with or pursuant to this Master Services Agreement or in connection with either party's or its Affiliates' business shall be deemed to be Confidential Information.   All Confidential Information, unless otherwise specified in writing, shall remain the property of the disclosing party, shall be used by the receiving party only for the intended purpose, and such written Confidential Information, including all copies thereof, shall be returned to the disclosing party or destroyed after the receiving party's need for it has expired or upon the request of the disclosing party.   Confidential Information shall not be reproduced except to the extent necessary to accomplish the purposes and intent of this Master Services Agreement, or as otherwise may be permitted in writing by the disclosing party.

16.2   The foregoing provisions of Section 16.1 shall not apply to any Confidential Information which (i) becomes publicly available other than through the actions of the receiving party; (ii) is required to be disclosed by a governmental or judicial law, order, rule or regulation; (iii) is independently developed by the receiving party; or (iv) becomes available to the receiving party without restriction from a third party provided that such source was not known by the receiving party to be in breach of an obligation of confidentiality owed to the disclosing party.   If any Confidential Information is required to be disclosed by the receiving party

Final    Hibernia Networks Proprietary Information        © Copyright 2011-2015 Hibernia Networks.
All rights reserved.

pursuant to the foregoing clause (ii), the receiving party shall, to the extent legally permitted, give reasonable advance notice to the disclosing party of the requirements of such disclosure.

16.3    Notwithstanding Sections 16.1 and 16.2 of this section, either party may disclose Confidential Information to its employees, agents, and legal, financial, and accounting advisors and providers (including its lenders and other financiers or those of its Affiliates) only to the extent necessary or appropriate in connection with the negotiation and/or performance of this MSA or its obtaining of financing; provided, however, that each such person is notified of the confidential and proprietary nature of such Confidential Information and is subject to and agrees to be bound by similar restrictions on its use and disclosure and the disclosing party under this section remains responsible for any breach by such persons of the Confidential Information.

16.4    If either party is required by law or similar process to disclose any Confidential Information, it will, to the extent legally permissible, provide the other party with prompt written notice of such request or requirement so that such party may seek an appropriate protective order and/or waive compliance with these confidentiality obligations. The party whose consent to disclose information is requested shall respond to such request, in writing within five (5) Business Days of the request by either authorizing the disclosure or advising of its election to seek a protective order, or if such party fails to respond within the prescribed period the disclosure shall be deemed approved.

16.5    The provisions of this Section 16 shall survive expiration or termination of the Agreement.

**17. TRADEMARKS AND NO-PUBLICITY**

Neither party may use the other party's name or trademarks, or issue any publicity or make any public statements concerning the other party or the existence or content of this Master Services Agreement, without the other party's prior written consent.

**18. NOTICES**

All notices and other communications required or permitted under this Master Services Agreement shall be in writing and shall be deemed to have been delivered to the other party's notice address specified on the signature page of this Master

Services Agreement in the absence of evidence of earlier delivery: (a) on the delivery date, if delivered by hand; (b) the next Business Day after being deposited for delivery with a recognized overnight courier; (c) on the date received if sent by facsimile with evidence of successful completion; or (d) three (3) Business Days after deposit in the mail. Either party may, by similar notice given, change the notice address to which future notices or other communications shall be sent.

## 19. WAIVER

The failure of either party at any time to enforce any right or remedy available to it with respect to a breach or failure of the other party shall not be construed to be a waiver of such right or remedy with respect to any other breach or failure by the other party. Except as otherwise provided herein, each of the rights and remedies of the parties set forth in this Agreement shall be cumulative with all other such rights and remedies, as well as with all rights and remedies of the parties hereto otherwise available at law or in equity.

## 20. RULES OF CONSTRUCTION

20.1 The captions or headings in this MSA are strictly for convenience and shall not be considered in interpreting this Master Services Agreement or as amplifying or limiting any of its content. Words in this Master Services Agreement which import the singular connotation shall be interpreted as plural, and words which import the plural connotation shall be interpreted as singular, as the identity of the parties or objects referred to may require.

20.2 Unless expressly defined herein, words having well known technical or trade meanings shall be so construed. All listing of items shall not be taken to be exclusive, but shall include other items, whether similar or dissimilar to those listed, as the context reasonably requires.

20.3 Except as set forth to the contrary herein, any right or remedy of Customer or Hibernia shall be cumulative and without prejudice to any other right or remedy, whether contained herein or not.

20.4 Nothing in this Master Services Agreement is intended to provide any legal rights to anyone not an executing party of this Master Services Agreement.

20.5 This Master Services Agreement has been fully negotiated between and jointly drafted by the parties and each party has been represented by counsel of its own choosing.

---

Final    Hibernia Networks Proprietary Information      © Copyright 2011-2015 Hibernia Networks.
All rights reserved.

20.6 In the event of a conflict between the provisions of this MSA and those of any Schedule, the provisions of this Master Services Agreement shall prevail and such Schedule shall be corrected accordingly. To the extent of any conflict between the provisions of this Master Services Agreement and those set forth on an associated Service Order Form, the terms of such Service Order Form shall govern.

20.7 All actions, activities, consents, approvals and other undertakings of the parties in this Master Services Agreement shall be performed in a reasonable and timely manner. Except as specifically set forth herein, for the purpose of this Master Services Agreement the normal standards of performance within the telecommunications industry in the relevant market shall be the measure of whether a party's performance is reasonable and timely.

## 21. NO PERSONAL LIABILITY; IMMUNITY

Each action or claim against a party arising under or in relation to this Master Services Agreement shall be made only against such party as a business entity, and any liability relating thereto shall be enforceable only against the assets of such party.

## 22. EXPORT CONTROL

The parties acknowledge that to the extent any products, software or technical information provided under this MSA are or may be subject to any applicable export laws and regulations, the parties agree that they will not use, distribute, transfer or transmit the products, software or technical information (even if incorporated into other products) except in compliance with such export laws and regulations (or licenses or orders issued pursuant thereto). If requested by either party, the other party agrees to sign all necessary export-related documents as may be required to comply therewith. Hibernia makes no representation or warranty with respect to obtaining any required governmental approvals for the export of any products, software or technical information.

## 23. GOVERNMENTAL APPROVALS; MATERIAL AUTHORIZATIONS

This Master Services Agreement is subject to the requirement that Hibernia obtain and continue such right-of-way agreements, governmental or municipal approvals, franchises, consents, authorizations, licenses and permits as may be required to fulfill its obligations hereunder (the "**Material Authorizations**"). Material Authorizations as used herein shall include but not be limited to Access Rights.

Hibernia will exercise commercially reasonable efforts to maintain, renew or replace all Material Authorizations during the Service Term.

Final    Hibernia Networks Proprietary Information      © Copyright 2011-2015 Hibernia Networks. All rights reserved.

## 24. RELATIONSHIP OF THE PARTIES

The relationship between the parties shall not be deemed to be that of partners, agents, or joint venturers for one another, and nothing contained herein shall be deemed to constitute a partnership or agency agreement between them for any purposes, including, but not limited to, tax purposes. Neither party grants the other party the power or authority to make any commitments on behalf of the other party.

## 25. PERFORMANCE

Customer expressly agrees and acknowledges that, notwithstanding that Hibernia shall be liable for all of the obligations ascribed to it under the Agreement; an Affiliate of Hibernia may perform such obligations.

## 26. EXPENSES

Hibernia and Customer shall be responsible for paying their own costs and expenses incurred in connection with the preparation and execution of this MSA and any related documents, including without limitation, fees and disbursements of counsel, financial advisors and accountants, any stamp and capital duties and taxes incurred in connection with this Master Services Agreement and the Services contemplated thereby.

## 27. SEVERABILITY

If any term, clause, provision, covenant or condition contained in this MSA is adjudicated to be illegal or unenforceable, all other terms, clauses, provisions, covenants or conditions of this Master Services Agreement shall remain in force, and the term, clause, provision, covenant or condition held illegal or unenforceable shall remain in effect as far as possible in accordance with the intention of the parties.

## 28. ENTIRE AGREEMENT; AMENDMENTS

This Master Services Agreement, together with the schedules and exhibits hereto and the applicable Service Order Form(s), sets forth the entire understanding of the parties and supersedes any and all prior agreements, arrangements and understandings relating to the subject matter of this Master Services Agreement (unless made fraudulently). This Master Services Agreement constitutes the entire and final agreement and understanding between the parties with respect to the subject matter hereof and supersedes all prior agreements relating to the subject matter hereof, which are of no further force or effect. The schedule and exhibits referred to herein are integral parts hereof and are hereby made a part of this

Master Services Agreement. This Master Services Agreement may only be modified or supplemented by an instrument in writing executed by a duly authorized representative of each party.

## 29. ASSIGNMENT

29.1   This Master Services Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns. Except as provided in this Section 29, neither this Master Services Agreement nor any of the rights, interests or obligations hereunder shall be assigned, transferred or otherwise disposed of or delegated by one party without the prior written consent of the other party.

29.2   Hibernia shall be permitted to assign, transfer or otherwise dispose of any or all of its rights and delegate any or all of its obligations under this MSA to any present or future Affiliate without the prior written consent of Customer. Hibernia shall give Customer notice of any such assignment, transfer or other disposition or any such delegation. Hibernia may grant a security interest in or make a collateral assignment of its rights hereunder and in the Hibernia Cable System to any one or more of its lenders without the consent of Customer. Hibernia shall obtain from such lender (the "**Secured Party**") a written non-disturbance agreement to the effect that such Secured Party acknowledges Customer's rights and interests in the Services and agrees that the same shall not be diminished, disturbed, impaired or interfered with in any manner that would adversely affect Customer's rights hereunder and Hibernia shall be responsible for ensuring such lender's compliance with Section 16 (Confidentiality) above.

29.3   Customer shall not be permitted to assign or transfer its rights or delegate its obligations under this Master Services Agreement at any time during the Service Term.

29.4   Any attempted assignment or transfer except an assignment or transfer permitted by this Section 29 shall be of no force or effect and shall be null and void.

## 30. COUNTERPARTS

This Master Services Agreement may be executed in one or more counterparts, all of which taken together shall constitute one and the same instrument.

---

Final    Hibernia Networks Proprietary Information      © Copyright 2011-2015 Hibernia Networks.
All rights reserved.

### 31. JURISDICTION AND CHOICE OF LAW

31.1    This Master Services Agreement is governed by the law of the state of New York of the United States of America.

31.2    Any dispute in relation to this Master Services Agreement will be referred to and finally resolved by arbitration in New York in accordance with the rules of the International Chamber of Commerce ("ICC Rules") for the time being in force, which rules are deemed to be incorporated by reference in this clause. The tribunal will consist of three arbitrator(s) to be appointed in accordance with the ICC Rules save that the president of the arbitral tribunal will be appointed by the party-appointed arbitrators, in consultation with the parties, within 30 days from their confirmation by the ICC Court. In the event that the party-appointed arbitrator fails to agree on a president within the prescribed deadline, the president of the arbitral tribunal shall be appointed directly by the President of the ICC Court, and not through a national committee. The language of the arbitration will be English.

31.3    Section 31.2 will not operate to prevent either party from applying to a court of competent jurisdiction for an emergency injunction or other such relief.

**[signatures appear on the next page]**

**IN WITNESS WHEREOF**, the parties have caused this Master Services Agreement to be signed by their duly authorized representatives as of the ███████████████████

**HIBERNIA EXPRESS (IRELAND) LIMITED**

By: _____

Name:    Bjarni K. Thorvardarson

Title:    Director

Notice Address:    c/o Hibernia Atlantic U.S. LLC d/b/a Hibernia Networks
                   25 De Forest Avenue, Suite 108
                   Summit, NJ 07901
                   Attention: General Counsel

**SUSQEHANA INTERNATIONAL GROUP LIMITED   "CUSTOMER"**

By: _____

Name:    Andrew Mullins

Title:    Director

Notice Address:    Susquehanna International Group Limited
                   2nd Floor, International Centre
                   Memorial Road, IFS
                   Dublin 1, Ireland

   Attention:    The Legal Department

Schedule A

Final     Hibernia Networks Proprietary Information        © Copyright 2011-2015 Hibernia Networks.
All rights reserved.

## Schedule B – Service Level Agreement

### I. PURPOSE

The purpose of this Service Level Agreement is to detail the level of service that Hibernia commits to provide with respect to availability and latency for ▮▮▮▮▮▮▮▮▮▮▮

### II. DEFINITIONS



**"Service Outage"** means the loss of more than one frame per second and the end of the service outage is signaled by three consecutive seconds of zero frame loss.

**"Unavailability Event"** means any instance when there is a Service Outage.

### III. LATENCY GUARANTEES



**NOTE:**

Final    Hibernia Networks Proprietary Information    © Copyright 2011-2015 Hibernia Networks.
All rights reserved.



Hibernia measures the latency on Ethernet circuits using RFC-2544 capable equipment, with a current and valid calibration certificate, and will only accept measurements based on this standard.

### IV.   AVAILABILITY GUARANTEE

### V.   EXCLUSIONS

Service level calculations exclude any instances when the Tier 1 Service is unavailable in whole or in part from one or more of the following causes:

- Hibernia or one of its agents being denied access to network components at the Customer location when access is required to complete trouble shooting, repair, diagnosis, or acceptance testing
- Customer's failure or refusal to release the circuit for testing
- Scheduled maintenance performed during the Scheduled Maintenance Window or otherwise approved by Customer
- If the Customer agrees to a reroute of the Service, the time that the Service is being provided on such alternate route shall not be considered to be unavailable for purposes of the Availability Guarantee.
- Any act or omission by Customer or its Affiliates, agents or invitees
- Force Majeure Events as defined in the MSA
- Any event caused by Customer-provided equipment
- Tail Circuits

Final   Hibernia Networks Proprietary Information      © Copyright 2011-2015 Hibernia Networks.
All rights reserved.

## VI.   CREDITS-



**Unavailability Event.**  In the case of an Unavailability Event, Customer will receive the following credit/refund) expressed as a percentage of the Assumed MRC for the Service:

Final    Hibernia Networks Proprietary Information     © Copyright 2011-2015 Hibernia Networks.
All rights reserved.



For prepaid Services, the percentage applies to the Assumed MRC.

All requests for service credits/refunds must be submitted by the Customer in writing to Hibernia. *In no event shall the credits/refunds owed by Hibernia in any given month exceed the Assumed MRC for the Service.*

Final    Hibernia Networks Proprietary Information    © Copyright 2011-2015 Hibernia Networks.
All rights reserved.

All service credits will be credited to Customer by way of a cheque, payable to Customer or as otherwise directed by Customer in the next full month following the event.

**VII.    TERMINATION OPTIONS**



(i)

(ii)

(iii)

(iv)

(v)

(vi)    where a Force Majeure Event under the Master Services Agreement prevents the performance by Hibernia of this Agreement for a period longer than ninety (90) days after first notification of such Force Majeure Event in accordance with Section 12 of the Master Services Agreement.

Should any of the foregoing situations arise, then the Customer may terminate the Service upon written notice to Hibernia. In such event, Hibernia will refund to Customer an amount equal to (i) the pro rate monthly amount of the Lease Fee *multiplied by* (ii) the

number of months remaining in the Service Term from the date of termination. If the Customer is paying for the Service on a monthly basis, their obligation to pay any future amounts shall cease as of the termination date specified by the Customer in its notice.

Final     Hibernia Networks Proprietary Information       © Copyright 2011-2015 Hibernia Networks. All rights reserved.